UNITED STATES *v.* DRYDEN RUBBER Co. (No. 3733) [1]

[1] T. D. 47050.

United States Court of Customs and Patent Appeals, April 30, 1934

*Charles D. Lawrence,* Assistant Attorney General (*Richard E. FitzGibbon,* special attorney, of counsel), for the United States.

*Tompkins & Tompkins* (*J. Stuart Tompkins* of counsel) for appellee.

[Oral argument December 12, 1933, by Mr. Lawrence and Mr. Tompkins]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

A machine for cutting rubber was imported at the port of Chicago, and was classified by the collector under paragraph 353 of the Tariff Act of 1930, under the third division of said paragraph, which paragraph is as follows:

PAR. 353. All articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy;

Electrical telegraph (including printing and typewriting), telephone, signaling, radio, welding, ignition, wiring, therapeutic, and X-ray apparatus, instruments (other than laboratory), and devices; and

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs;

All the foregoing, and parts thereof, finished or unfinished, wholly or in chief value of metal, and not specially provided for, 35 per centum ad valorem.

The importer protested, claiming the goods to be dutiable as "all other machines, finished or unfinished, not specially provided for", under paragraph 372 of said act.

The United States Customs Court, on protest, held the goods to be separable for tariff purposes, and that that part of the machine consisting of electric motors was dutiable as classified, while the balance was dutiable as claimed in the protest. The Government has appealed.

The imported goods consisted of a knocked down machine, for cutting sponge rubber cake, imported in four cases. The machine is, in substance, a horizontal band saw, with its necessary mountings and fittings. When set up, the machine is about 6 feet wide and 10 feet long. A platform 36 inches wide and 60 inches long carries the rubber cake, and slides upon a track beneath the saw. As the platform carries the rubber cake under the saw, a slice is removed from the cake. A crank is then turned, the cake is elevated, and another slice removed, and so on.

Two electric motors accompanied the machine. The exact capacity of these motors is not shown, although it is stated that one of them is "very small." One motor furnishes the motive power for the machine. This motor is attached to the bottom plating of the machine. The other small motor is mounted on the "right-hand side" of the machine and furnishes the motive power for two small emery wheels, each about 2 inches in diameter, which are in constant contact with the blade, one from the top and one from the bottom. This is shown to be necessary, as "the blade must be kept in a continuous sharp condition."

When the machine was imported, bolt holes for the attachment of these two motors had been provided in the proper places. As to the grinding element, the invoice designates it as "1 grinding machine with motor starter (built-in)." No photographs or exhibits have been furnished and our knowledge of the character and appearance of the machine is confined to the record, as above stated.

The first question presented is whether the imported goods constitute, for dutiable purposes, an entirety under said paragraph 353. This paragraph appeared for the first time in the Tariff Act of 1930, where an attempt was made to gather many electrical products into one dutiable provision. Some reference is made to the legislative history of this provision in *United States* v. *Cramer, Inc.*, on rehearing, 22 C.C.P.A. (Customs) 45, T.D. 47049. Prior to the Tariff Act of 1930, goods now classifiable under said paragraph 353 had been variously classified.

An examination of the language of the third division of this paragraph discloses that the articles therein *eo nomine* specified are of various types; they have, however, one characteristic in common, an

essential electrical feature. A fan, a washing machine, and a sign seem to have little resemblance, but their analogy rests in the fact that electricity is the essential feature which causes them to function and perform their work. The language evidently was intended to be read, "articles * * * such as electric motors, fans", etc., thus giving these named articles as examples of such as are intended to be covered by the paragraph.

Many of the articles named in said language are such as might well function with the aid of other than electrical power, if it were not for the fact that, by being named therein, they must be considered as electrical in their nature; that is, a fan, to be included within the language, must be an electrical fan, a heater must be an electrical heater, a washing machine must be an electrical washing machine, a portable tool must be an electrical portable tool, and so on.

There are two inquiries, therefore, when the question of the classifiability of an article under this division of the paragraph is under consideration: First, is it essentially an electrical article? The electrical feature must be an essential feature, without which the article will not function, normally, for the purposes intended, for, it must be manifest, that if it be not an electrical article, it does not come within the division at all. Second, if it is such an electrical article, is it an article named in the language, or within the class of articles named in this paragraph?

From what has been said, it follows that if the article, when it is imported, is designed and constructed to use electrical power, or other power, interchangeably, then it has not, as an essential feature, an electrical element or device.

On the other hand, if, when the article is imported, it is so constructed as to utilize electrical power solely, and, therefore, is, essentially, an electrical article, and its various parts are imported, are intended to be used, and are used, together, as was the case with the imported merchandise, then no reason can be seen why it should not be considered, for dutiable purposes, within the scope of the third division of this paragraph, for in such case, we think the article should be held to be included within the class of articles named in the paragraph.

The classification of the imported article must rest upon its condition as imported. If it has, then, as an essential feature, an electrical element or device, it may not be taken from the scope of this section and classified elsewhere, because it may be shown that some other form of power might, by modification, be applied to it. In other words, a washing machine with a motor fitted to cause it to operate, and which is intended to be, and is, used therewith, and with no other provision for normally operating it, is an electrical washing machine, and was evidently intended to be classified as such.

We are not now discussing the dutiable status of parts of the articles provided for in said paragraph, or of such articles, or parts, unfinished, as that question is not before us.

We are then brought to the inquiry whether the imported machine for cutting rubber was a machine such as was intended to be included within this subparagraph. The machine is a horizontal band saw of moderate size and is such a device as could be easily moved from place to place. In view of the very evident intent of the Congress to gather, generally, various types of electrical devices into this paragraph, it is believed that this machine, if essentially an electrical machine, may properly be considered as of the class to which the stated language of the paragraph refers.

Assuming this to be true, are the two motors which were imported with the saw, essential features of the device? As to the small motor and its accompanying grinders, it seems to be unquestioned that these constitute an essential feature of the device. Whether or not the presence of the small motor would constitute this article an electrical machine within the meaning of the third division of this paragraph is not necessary to be here decided, in view of a holding as to the large motor.

When the machine was imported in a knocked-down condition, this motor accompanied it and there were bolt holes drilled in the metal bottom plating for the attachment of the motor. The motor is of the proper size to drive the machine, and no other method of applying power is provided or arranged for. No other power can be applied without a reconstruction of the machine, in part. The testimony shows that hand power could be applied by removing the motor and installing a pulley with a handle. If it were desired to operate the machine by direct drive, the witness Kinsley stated that he would "put a jack shaft on the floor, remove the motor, and run it by the main line of the shaft." In other words, as imported, the machine is an electrical machine.

Our attention is directed to *Columbia Shipbuilding Co.* v. *United States*, 11 Ct. Cust. Appls. 281, T.D. 39085, which is claimed by appellee to be conclusive as to the classification of the articles here involved. In the case cited, the imported merchandise consisted of upright steam boilers and fans or blowers, shipped together, but detached, and intended to be used together. They were assessed as entireties, as manufactures of metal, under paragraph 167 of the Tariff Act of October 3, 1913, and the engines were claimed to be separable for duty purposes as steam engines, under the *eo nomine* provision therefor, in paragraph 165 of said act. This court sustained said protest, holding that the engine, although shipped with the fan, still remained a "steam engine", as named in said paragraph 165.

The cases, however, are not strictly analogous. In the case at bar, the inquiry is not whether we have a motor or a saw, but whether we have an *article* which has *as an essential feature an electrical element*. The cases might be held to be analogous if, under the act of 1913, there had been a provision for *articles having as an essential feature a steam engine*.

*Coxhead Corp.* v. *United States*, 22 C.C.P.A. (Customs) 96, T.D. 47080, decided concurrently herewith, is in harmony with the views herein expressed.

In our opinion the imported goods constituted an entirety within the meaning of paragraph 353 and the judgment of the United States Customs Court is *reversed*, insofar as it holds the rubber cutting machine to be separable and dutiable under paragraph 372 of the Tariff Act of 1930. In other respects the judgment is *affirmed*.

### DISSENTING OPINION

GARRETT, Judge: Being unable to agree with my associates in the conclusion reached by them in this case, I respectfully dissent. It is my opinion that the trial court arrived at the correct conclusion and that its judgment should be affirmed, and I shall, as briefly as is consistent with clearness, state my reasons.

The majority here holds classifiable as an entirety what seems to me to be an aggregation comprising an assembly of devices, each device complete within itself and having a distinctive character which renders it easily capable of segregation for tariff classification. The complete mechanism consists of: (1) A machine for slicing cakes of rubber; (2) a motor for operating the machine, and (3) a second motor (which is small), operating emery wheels that keep the saw blade constantly sharpened.

The third feature may be defined as a subassembly comprising the small motor and the emery wheels which it operates.

The specific portion of paragraph 353 of the Tariff Act of 1930, under which the collector of customs classified the complete assembly is subdivision 3 thereof, reading:

articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs;

It is agreed by all that the word "electric" modifies each of the articles *eo nomine* provided for in the foregoing subdivision—that is, the fans must be electric fans; the locomotives electric locomotives, etc.

It is fully recognized that many difficulties arise in administration where separate classifications of different members of a structure are attempted, and generally the doctrine of entireties is thought to be favored in legislation, but instances arise, as is illustrated by many decisions of this and other courts, where, in order to comply with the

master rule of enforcing legislative intent, separate classification becomes practically mandatory. I think the case at bar presents such a situation.

As is said in the majority opinion, in effect, paragraph 353 of the Tariff Act of 1930 is new to tariff legislation. The legislative history shows that it originated in the Committee on Ways and Means of the House of Representatives and was included as an integral part of the bill reported to the House. Accompanying the bill was a committee report which explained the new paragraph in the following language:

ELECTRICAL MACHINERY AND APPARATUS

The products of this important group of industries are now dutiable under two paragraphs. Transformers; wiring devices, control apparatus, etc., are assessed at 40 percent as manufactures of metal, n.s.p.f. under paragraph 399, whereas generators and motors, which are more expensive and difficult to manufacture and more susceptible to competition, are assessed at only 30 percent as machines, n.s.p.f. under paragraph 372. Furthermore, litigation over the meaning of the term "machine", as applied to electrical equipment, has resulted in transferring some products to the machinery paragraph and leaving similar products classified under paragraph 399. The industry is of such importance that separate classifications of its products are warranted, which is done by this bill. (Rept. No. 7, 71st Cong., 1st sess., p. 43.)

From the foregoing explanation, it seems obvious to me that the Congress was seeking by this new paragraph to do two things: First, harmonize classification of strictly electrical machinery and apparatus; and, second, provide an increase in duty upon certain of such articles, such as generators and motors. I regard as significant the last sentence of the above quotation from the committee report, reading: "The industry is of such importance that *separate classifications* of *its* products are warranted, which is done by this bill." (Italics mine.)

I construe the report to mean that Congress was endeavoring to give the strictly electrical industry a greater degree of protection upon at least some of its products than had been given theretofore, and I do not believe that it was the legislative intent to have complete machines drawn, in all instances, within paragraph 353 simply because they are motor operated. I wish to be entirely fair to the majority opinion and it is proper to state that it does not here go so far as to hold that all motor-operated devices do fall within the paragraph for that reason, but I confess my inability clearly to understand just where the majority propose to draw the line of demarcation. As best I can interpret what is said upon that question, I fear it will lead to great administrative difficulties, particularly in the classification of parts imported separately. It is worthy of note that paragraph 372 of the Tariff Act of 1930 seems to provide a lesser rate of duty upon machines of the type of the actual rubber cutting device here at issue, than did paragraph 372 of the Tariff Act of 1922.

Since the 1930 act, like the 1922 act, is avowedly a protective act, it is to be presumed that the Congress felt that proper protection was assured the machine industry (that is of those producing such machines as this) at a lesser rate than had theretofore prevailed. Nevertheless, under the classification upheld by the majority here, the rubber-cutting machine which is complete in itself, is to bear a rate higher than was provided for it, by itself, in either the act of 1922 or that of 1930, the classification being controlled by the type of motive power which operates it. This is said without giving consideration to the matter of "parts", as provided for in the fourth subdivision of paragraph 353.

I am perfectly well aware of the fact that the third subdivision of paragraph 353, *supra*, does include *eo nomine*, a number of devices which have motors in or connected with them. I assume that a motor operated washing machine, for example, being *eo nomine* provided for therein, and the motor which operates it, must be classified together as an entirety, and so of other articles, specifically named, and articles "such as" those named. The wording of the paragraph, providing for "motors" *per se*, and then for other articles which contain motors, I am frank to say, renders it ambiguous to me and difficult of construction.

It may be that in applying it the necessity will frequently arise of invoking the doctrine of *ejusdem generis*, in order to enforce legislative intent, but I see no place for its application to the complete structure now before us.

I can readily see that the subassembly consisting of the small motor and emery wheels for grinding the saw, may well be held, as a device complete in itself, to be *ejusdem generis* with electric portable tools, and so be carried, as a whole, under paragraph 353, but it should not carry the rubber-cutting structure with it, because in itself it constitutes no actual integral part of the cutting machine. I think, for the reasons later stated, the same is true of the large motor which drives the band saw and the rubber-cake carrier.

The rubber-cutting machine by itself does not seem to me to be *ejusdem generis* with any of the articles provided for *eo nomine*. It is not, to my mind, *per se*, an article "such as" any of those named. The only ground upon which I discern the possibility of applying the *ejusdem generis* doctrine is by taking the operating element—the motor—into consideration and, I think, this extends the doctrine beyond its legitimate limits.

The record in the case at bar is a meager one and, in view of the importance attaching to the construction of paragraph 353, it is greatly to be regretted that fuller evidence was not presented upon certain matters. There is practically no description of the large motor. Nothing is shown, for example, as to its suitability as im-

ported for supplying operating power to other devices than the rubber-cutting machine. Whether it was manufactured along with the cutting machine is not shown. The burden of overcoming the presumption of correctness of the collector's classification and of showing such facts as required separate classifications, of course, rested upon protestant, and a better description of the motor might have been quite helpful.

However, it was shown that the motor, whatever it may be like, or otherwise suitable for, is here simply the motive power for operating the machine. It is not integral with it in the sense of being built into it. The trial court found as a fact, I think correctly—indeed, it is undisputed—that "the only provision made on the machines for the motors consists of bolt holes." According to the testimony the operating motor is attached "to the bottom plating" of the rubber-cutting machine. The fair presumption is that the bolt holes referred to are the holes in said plating.

It further appears, as was found by the trial court, that the rubber-cutting device could be operated "without either of said motors either by hand power or by direct drive." It is suggested, however, that in order to do this modification of the machine must be made. If by machine, as so used, the complete structure, or, as I view it, the aggregation, is meant, the necessity for modification must be conceded, since the motor would be removed and other power devices substituted, but no modification of the cutting machine itself would be required. The new power device would simply be substituted for the motor without any change as to the mechanism of the cutter, per se.

Such being the undisputed facts, it seems to me that segregation and separate classification is entirely practical, and it is my belief that such was the legislative intent.

A part of the legislative history of the paragraph (substantially all material parts of which we have set forth in our opinion in the case of United States v. R. W. Cramer & Company, Inc., 22 C.C.P.A. (Customs) 45, T.D. 47049, recently decided) is that after the bill had passed the House of Representatives, the Committee on Finance of the Senate to which it was referred, suggested certain amendments which were not adopted by the Senate. The report of the Senate committee explained the purpose of the amendments so proposed. The report indicates that the amendments related to the insertion of certain language in paragraph 353 and the striking out of certain language in paragraph 368—the clockwork paragraph—and it was explained that under the amendments:

* * * The clockwork mechanisms are intended to be assessed separately hereunder, while the electrical devices minus the value of the clockwork mechanisms are intended to be assessed under paragraph 353.

Since something was said in the Senate committee's report about separate classification being provided by one of the amendments, and since the amendment was rejected, it is suggested that the logical inference is that the legislative intent was to classify as entireties.

Assuming this to be true, certainly it applies to nothing other than the specific articles discussed—electrical clocks—and I find no indication that it applies to articles such as that at bar. I certainly find nothing in the legislative history subsequent to the House report above quoted which indicates any disagreement with the last sentence of that report, which has been already separately quoted, *supra*.

I believe the trial court has correctly interpreted the paragraph, insofar as this case is concerned, and that its interpretation conforms to the clear intent of Congress.